## No. 22-55137

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

SUZHOU ANGELA ONLINE GAME TECHNOLOGY CO., LTD, a Chinese
Corporation; IMPERIUM INTERACTIVE ENTERTAINMENT LIMITED, a
Hong Kong corporation,

*Plaintiffs, Counter-defendants – Appellants,*
v.

SNAIL GAMES USA, INC., a California corporation; WILDCARD PROPERTIES
LLC, a Florida Limited Liability Company,

*Defendants, Counter-claimants – Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
No. 2:21-cv-09552-CAS-SK

The Honorable Christina A. Snyder, District Court Judge

# APPELLEES' ANSWERING BRIEF

Robert M. Schwartz
Daniel C. Posner
Moon Hee Lee
Taylor Morris
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Michael LaFond
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood City, CA 94065
(650) 801-5000

*Counsel for Defendants, Counter-claimants – Appellees*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Snail Games USA Inc. ("Snail USA") hereby states that Snail USA is a privately held corporation. Snail USA's sole parent and sole shareholder is Suzhou Snail Digital Technology Co., Ltd. ("Snail Games"). No publicly held corporation owns 10% or more of Snail USA's stock.

DATED: March 31, 2022      Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By: */s/ Robert M. Schwartz*
    Robert M. Schwartz
    Attorneys for Appellees
    Snail Games USA, Inc. and
    Wildcard Properties LLC

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..............................................................................................1

STATEMENT OF JURISDICTION.................................................................6

STATEMENT OF ISSUES ..............................................................................6

STATUTORY PROVISIONS ...........................................................................7

STATEMENT OF THE CASE ........................................................................7

    A.    SWC developed and published *Ark*.......................................7

    B.    Former SWC employees went to Angela and released *MoE* .............10

    C.    SWC discovered massive source code overlap between the games.........................................................................................12

    D.    Valve decided to take down *MoE* from Steam after receiving SWC's DMCA takedown notice .......................................17

    E.    The district court declined to require SWC to withdraw its DMCA takedown notices to Valve and other services .......................19

SUMMARY OF ARGUMENT ......................................................................19

STANDARD OF REVIEW ............................................................................22

ARGUMENT ..................................................................................................23

I.    THE COURT SHOULD DISMISS THE APPEAL BECAUSE ANGELA LACKS STANDING ...................................................23

II.    THE COURT SHOULD REJECT ANGELA'S MADE-UP INTERPRETATION OF SECTION 512 ........................................26

    A.    Section 512(c) does not require a copyright owner to prove its entitlement to a takedown of the infringing material .........................26

    B.    Section 512(g) requires the service provider to continue to keep the infringing material taken down, if a copyright owner seeks a court order to restrain the user from copyright infringement.............30

    C.    Section 512(j) does not support Angela's fictitious DMCA reading ...............................................................................36

III.  THE DISTRICT COURT CORRECTLY CONCLUDED THAT ANGELA, AS THE MOVANT SEEKING A MANDATORY INJUNCTION, HAD THE BURDEN OF PROVING THAT THE *WINTER* FACTORS "CLEARLY FAVOR" THE RELIEF ........................ 37

    A.  Angela—not SWC—must establish each of the four *Winter* factors to obtain preliminary relief ......................................................... 37

    B.  Because Angela requested a mandatory injunction, it must show that the law and facts clearly favor its position .................................. 40

IV.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT NONE OF THE *WINTER* FACTORS SUPPORTED A PRELIMINARY INJUNCTION ....................................... 44

    A.  The district court did not abuse its discretion in finding that Angela failed to show likelihood of success on the merits ................ 44

    B.  The district court did not abuse its discretion in finding that Angela lost under the remaining *Winter* factors ................................. 46

CONCLUSION ....................................................................................... 49

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adtrader, Inc. v. Google LLC*,
   2018 WL 1876950 (N.D. Cal. Apr. 19, 2018) ....................................................47

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ...............................................................38

*California by and through Becerra v. Azar*,
   950 F.3d 1067 (9th Cir. 2020) ..............................................................46

*Caplan v. Fellheimer Eichen Braverman & Kaskey*,
   68 F.3d 828 (3d Cir. 1995)...................................................................47

*City of S. Lake Tahoe v. Cal. Tahoe Reg'l Plan. Agency*,
   625 F.2d 231 (9th Cir. 1980)..................................................................23

*Columbia Pictures Indus., Inc. v. Fung*,
   710 F.3d 1020 (9th Cir. 2013) ........................................................ 34, 35

*Consumer Opinion LLC v. Frankfort News Corp.*,
   2016 WL 6804607 (N.D. Cal. Nov. 17, 2016) ...................................................42

*Curtis v. Shinsachi Pharm. Inc.*,
   451 F. Supp. 3d 1190 (C.D. Cal. 2014) .............................................................31

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008)..............................................................................23

*DISH Network Corp. v. FCC.*,
   653 F.3d 771 (9th Cir. 2011)................................................................ 22, 38

*Disney Enters, Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017)................................................................ 38, 44

*E. & J. Gallo Winery v. Andina Licores S.A.*,
   446 F.3d 984 (9th Cir. 2006) ..............................................................42

*Ellison v. Robertson*,
   357 F.3d 1072 (9th Cir. 2004) ........................................................ 27, 35, 40

*English v. Ryland Mortgage Co.*,
　2016 WL 6820365 (D. Md. Nov. 16. 2016) ........................................................39

*Garcia v. Google, Inc.*,
　786 F.3d 733 (9th Cir. 2015)........................................................ passim

*Golan v. Holder*,
　565 U.S. 302 (2012) ............................................................................48

*Gonzales v. Gorsuch*,
　688 F.2d 1263 (9th Cir. 1982) ...........................................................24

*GoTo.com, Inc. v. Walt Disney Co.*,
　202 F.3d 1199 (9th Cir. 2000) .................................................... 41, 42

*Hendrickson v. Amazon.Com, Inc.*,
　298 F. Supp. 2d 914 (C.D. Cal. 2003) ...............................................35

*Hendrickson v. Ebay, Inc.*,
　165 F. Supp. 2d 1082 (C.D. Cal. 2001) ..............................................35

*Indep. Towers of Wash. v. Washington*,
　350 F.3d 925 (9th Cir. 2003)...................................................... 44, 49

*L.A. Memorial Coliseum Comm'n v. Nat'l Football League*,
　634 F.2d 1197 (9th Cir. 1980) ............................................. 38, 46, 48

*Lamie v. United States Trustee*,
　540 U.S. 526 (2004) ...........................................................................33

*Lenz v. Universal Music Corp.*,
　815 F.3d 1145 (9th Cir. 2016) ................................................ 30, 33, 37

*Long v. Dorset*,
　369 F. Supp. 3d 939 (N.D. Cal. 2019), aff'd, 854 F. App'x 861 ........................35

*Lopez v. Candaele*,
　630 F.3d 775 (9th Cir. 2010).............................................................23

*Lujan v. Defs. of Wildlife*,
　504 U.S. 555 (1992) ...........................................................................23

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
  571 F.3d 873 (9th Cir. 2009) .......................................................... 40, 41

*Marvix Photographs, LLC v. Livejournal, Inc.*,
  873 F.3d 1045 (9th Cir. 2017) ............................................................. 35

*Medtronic Inc. v. Mirowski Family Ventures, LLC*,
  571 U.S. 191 (2014) .................................................................. 4, 39, 40

*Net Connection Hayward, LLC v. City of Hayward*,
  2013 WL 3786635 (N.D. Cal. July 18, 2013) ...................................... 39

*Novak v. United States*,
  795 F.3d 1012 (9th Cir. 2015) ............................................................. 25

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007) ............................................................. 40

*Perfect 10, Inc. v. Google, Inc.*,
  653 F.3d 976 (9th Cir. 2011) ............................................................... 47

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
  944 F.2d 597 (9th Cir. 1991) ............................................................... 46

*Rossi v. Motion Picture Ass'n of Am., Inc.*,
  391 F.3d 1000 (9th Cir. 2004) ....................................... 29, 30, 31, 45

*Ry. Labor Execs. Ass'n v. Dole*,
  760 F.2d 1021 (9th Cir. 1985) ............................................................. 26

*Skidmore v. Led Zeppelin*,
  952 F.3d 1051 (9th Cir. 2020) ............................................................. 13

*Stanley v. Univ. of S. Cal.*,
  13 F.3d 1313 (9th Cir. 1994) ......................................................... 40, 41

*Stardock Sys., Inc. v. Reiche*,
  2018 WL 7348858 (N.D. Cal. Dec. 27, 2018) ................................ 29, 45

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ............................................................................... 25

v

*Tanner Motor Livery, Ltd. v. Avis, Inc.*,
   316 F.2d 804 (9th Cir. 1963)................................................................42

*Townley v. Miller*,
   722 F.3d 1128 (9th Cir. 2013) ...........................................................24

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
   718 F.3d 1006 (9th Cir. 2013) ..................................... 27, 33, 34, 35

*United States v. N.Y. Tel. Co.*,
   434 U.S. 159 (1977).............................................................................43

*Ventura Content, Ltd. v. Motherless, Inc.*,
   885 F.3d 597 (9th Cir. 2018)...................................................... 28, 36

*Viacom Int'l Inc. v. YouTube, Inc.*,
   940 F. Supp. 2d 110 (S.D.N.Y. 2013)...............................................35

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
   529 U.S. 765 (2000)............................................................................24

*Wash. Env't Council v. Bellon*,
   732 F.3d 1131 (9th Cir. 2013) ...........................................................23

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).................................................................... 3, 37, 38

*WPIX, Inc. v. ivi, Inc.*,
   691 F.3d 275 (2d Cir. 2012)...............................................................48

*Yazzie v. Hobbs*,
   977 F.3d 964 (9th Cir. 2020)...................................................... 25, 26

## **Statutes**

17 U.S.C. § 512(c) ....................................................... passim

17 U.S.C. § 512(f)............................................... 3, 18, 36, 43

17 U.S.C. § 512(g) ....................................................... passim

17 U.S.C. § 512(j) .............................................................. 21, 36

28 U.S.C. § 1651(a) ................................................................43

## **Other Authorities**

2 Melvile B. Nimmer & David Nimmer,
  Nimmer on Copyright, § 7.16[B][5][b] (2021 ed.) .............................................9

S. Rep. No. 105-190 (1998) ...................................................... 27, 28, 31

## **INTRODUCTION**

The appeal of Appellants Suzhou Angela Online Game Technology Co., Ltd and Imperium Interactive Entertainment Limited (collectively, "Angela") fails to demonstrate any basis for this Court to reverse the district court's denial of Angela's motion for a preliminary injunction. The appeal is based on non-existent legal principles, a gross misreading of the Digital Millennium Copyright Act ("DMCA"), and a distorted presentation of the facts. Even more problematic, Angela lacks Article III standing to have sought the injunction in the first place.

That injunction would have mandated that Appellees Snail USA and Wildcard Properties LLC ("Wildcard") (collectively, "SWC") withdraw "takedown" notices they served on non-parties, such as Valve Corporation, under section 512(c) of the DMCA.[1] SWC served a takedown notice on Valve because Valve was selling Angela's videogame, *Myth of Empires* ("*MoE*"), on its highly popular online store, known as Steam. Consistent with the letter and purpose of the DMCA, SWC had a right to request that Valve remove Angela's game; SWC had a good-faith belief that it infringes the copyright in the source code for SWC's game, *Ark: Survival Evolved* ("*Ark*").

Valve chose to comply with SWC's request, as it had the right to do. Angela then exercised its DMCA right to tell Valve that its game does not infringe, and

---

[1] Unless stated otherwise, all statutory references are to Title 17 of the U.S. Code.

asked Valve to reinstate *MoE* for that reason. Valve declined. The DMCA worked as intended. Angela does not contend otherwise.

Nevertheless, after filing a preemptive lawsuit against SWC for a declaration of non-infringement of copyright, Angela sought a preliminary injunction asking the district court to order SWC to retract its DMCA takedown request. The district court denied Angela's motion. It found Angela's evidence of claimed non-infringement lacking, especially as compared to a "plethora" of SWC evidence that Angela's game infringes SWC's code. 1-ER-16-17. That evidence is reflected in the Order denying Angela's motion. It is devasting to Angela, and included:

1. the results of a preliminary code analysis showing "hundreds of near-identical function names" between the two games;

2. the declaration of a computer code expert who concluded that the "'extent of similarities already identified … raises serious concerns that computer source code for [*MoE*] was copied from [SWC's] computer source code'";

3. evidence showing that "of the 82 Angela Games employees who worked on [*MoE*], 60 are ex-employees of Snail Games who quit to join Angela Games in 2019," around the time when Angela started developing *MoE*; and

4. evidence showing that "at least one of those employees, Yang Li Ping, was given access to the [*Ark*] code base."

*See* 1-ER-16. The district court also received a third-party declaration from a code developer who has worked with both parties, stating that *MoE* contained implementation code Wildcard wrote for *Ark*'s anti-cheating software, which is

unique to *Ark*, and has no reason to appear in *MoE* unless it was copied from *Ark*. *See* 1-ER-8-9, 15-17.

The district court held that Angela had failed to show that a likelihood of success on the merits, irreparable injury, or any of the other preliminary injunction factors under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008), tipped in its favor. *See* 1-ER-21.

On appeal, Angela does not contend—because it cannot—that the district court committed an abuse of discretion on its findings on the *Winter* factors. Instead, Angela asks this Court to upend the DMCA's well-established takedown procedures by ordering the withdrawal of SWC's takedown notice, without any justification other than that Angela dislikes how Congress wrote the law. To get there, Angela presents a construct pulled from thin air: A copyright owner who invokes the DMCA's *non-judicial* takedown rights (which SWC did before Angela sued) is to be treated by the district court as if the copyright owner had moved for an injunction against an infringer. From this, Angela advances two more equally specious notions: First, when an alleged infringer (Angela here) moves for an injunction compelling the copyright owner (SWC here) to withdraw its DMCA notice, the **copyright owner** must establish in the district court its right to such takedown "relief" as if it were the moving party on a motion for an injunction. Br. at 23-24, 32, 34-36. Second, if the copyright owner does not prove its right to that

3

injunction, it must withdraw the takedown notice and the infringing content must be restored. *Id.* at 22, 27-30.

There is no support for these principles in the DMCA. Nor has any court endorsed Angela's fictions or the time-honored standards for a preliminary junction. And for good reason. In enacting the DMCA, Congress said nothing that would support Angela's positions. Section 512(c) provides a safe harbor for service providers; it does not constitute a non-judicial "injunction" for a copyright owner. In fact, the only remedy Congress provided to a party in Angela's shoes is an action for money damages, and only if Angela can prove that the DMCA notice was the product of knowingly false statements. *See* Section 512(f). If Congress had wanted to authorize district courts to do what Angela requests, it would have done so. It did not.

Based on its flawed reading of section 512, Angela argues that the district court improperly required the moving party Angela, instead of the non-moving party SWC, to establish its entitlement to a preliminary injunction. *See* Br. at 31-35. That has never been the law. Because Angela asked the district court to apply its equitable powers to command SWC to take action, it bore the burden on its motion. Nothing in Section 512 (or Angela's misreading of the Supreme Court's decision in *Medtronic*, discussed below) changes that.

Angela also argues that the district court erred by imposing a heightened burden on Angela because the injunction was mandatory, not prohibitory. Br. at 25, 36. Again, Angela is wrong. Angela did not seek to bar SWC from doing something it had not done—a prohibitory injunction that preserves the status quo. Instead, Angela sought to compel SWC to take affirmative steps—the same ones that Angela's complaint prays for as a post-trial remedy. That makes it a mandatory injunction. Angela thus bore that heightened burden.

But even if Angela is right that it sought only a prohibitory injunction, or that SWC somehow bore the burden of proof on Angela's motion, as noted above, the district court found Angela's showing so weak that it could not have satisfied even a lower standard. *See* 1-ER-17.

Regardless of those merits issues, the Court should dismiss Angela's appeal at the starting gate because Angela lacks Article III standing. That is because there is a mismatch between the alleged harm (Valve's "takedown" of *MoE*) and the remedy Angela seeks (an injunction mandating that SWC withdraw its takedown request). Even if SWC withdraws its DMCA notice, that does not mean that non-party Valve—who is not a subject of a court order or the district court's jurisdiction—would choose to resume selling *MoE*. That is Valve's decision to make regardless of the outcome of Angela's request for an injunction. And, as Valve would likely recognize (consistent with its conduct to date), restoring *MoE*

5

is a risky decision because Valve would have forfeited the DMCA safe harbor. Because Angela's claimed injury would not be redressed by the order it seeks, Angela lacks standing. For that reason too, the Court must reject the appeal.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction to hear this action under 28 U.S.C. §§ 1331, 1338, 1367, 1368, 2201, 2202 and 18 U.S.C. § 1836(c). If this Court had subject matter jurisdiction over this appeal, then it would have appellate jurisdiction under 28 U.S.C. § 1292(a)(1) to review the district court's preliminary injunction order. This Court, however, lacks subject matter jurisdiction, because Angela cannot establish standing as required by Article III of the U.S. Constitution. *See* Argument, Section I.

## STATEMENT OF ISSUES

1.     Is Angela's alleged injury based on non-party Valve's choice to remove Angela's game, *MoE*, from its Steam platform fairly traceable to SWC's issuance of DMCA takedown notice so as to meet the redressability element of Article III standing?

2.     Did the district court appropriately exercise its discretion in denying a mandatory preliminary injunction requiring SWC to withdraw its takedown notice to Valve and other services that hosted or are continuing to host *MoE*?

## STATUTORY PROVISIONS

Under Circuit Rule 28-2.7, pertinent statutory provisions are contained in an addendum to this brief.

## STATEMENT OF THE CASE

### A.  SWC developed and published *Ark*

This case concerns two video games and their overlapping source code:  *Ark* and *MoE*.  These immersive online games require the player to take steps to survive in the game-world.  *Ark* takes place in a primordial world where players build houses, tame and breed animals, craft objects, and band together in tribes as they attempt to survive in a treacherous natural world.  2-ER-174-75, 201.  *MoE* takes place in a world of human wars where players "build fortresses, lead armies in battle, siege enemy cities, and establish their own empires while fighting to survive and earn their place in a war-torn world."  9-ER-1998.  Both games let players engage in similar activities such as animal breeding, use similar mechanics for snapping together building materials, and form social groups.  2-ER-174-75.

Wildcard began developing *Ark* in 2014.  7-ER-1705.  Wildcard has invested approximately $90 million to create *Ark*, which required help from more than 100 employees, contractors, and engineers.  6-ER-1224-25; 7-ER-1692.

In June 2015, Wildcard released an early-access, public "beta" form of *Ark*. 2-ER-173.  That year, video game publisher Snail USA (whose Chinese parent company is Snail Games) bought Wildcard.  6-ER-1224.  SWC published *Ark* in its

7

complete, retail form on August 29, 2017 for Microsoft Windows, Sony's PlayStation 4, and Microsoft's Xbox One.  6-ER-1269.  SWC timely registered its copyrights in *Ark*, which include U.S. Copyright Registration Nos. TX0008844750, TX0008850188, and TX0008850190, and submitted the required deposit copies according to the U.S. Copyright Office's procedure.  6-ER-1404-05, 1424-41.  The copyright registrations in *Ark* cover the program, including source code, as well as its text and art.  6-ER-1424-35.

*Ark* was a resounding commercial success.  By the end of 2021, over 40 million copies of *Ark* had been sold, and the game has brought in more than $700 million.  6-ER-1225.

In the wake of *Ark*'s success, SWC built on *Ark*'s source code to develop a follow-up game: *Atlas*.  Angela harps on the fact that SWC's source code analysis mentions both *Ark* and *Atlas*; and Angela claims, without any basis, that *Atlas* is an "entirely distinct work."  Br. at 19; *see also id.* 16-17.  Not so.  "*Atlas* is a Snail-owned product derived from *Ark*," and as such they share substantial code.  2-ER-174, 176-77, 184-85, 193-94.  Hence, unsurprisingly, SWC uncovered matches between the source code in *MoE* and source code found in both *Ark* and *Atlas* (discussed below).  2-ER-189.  Angela is also wrong to claim that SWC misrepresented its source code comparison as being limited to *Ark*.  Br. at 16-17, 19.  SWC has always made clear that it compared "Ark/Atlas code" to *MoE*.  6-

ER-1235 (noting in SWC's first—not supplemental—opposition, the "'ARK'/'ATLAS' game code base found in 'Myth of Empires' v3"); *see also* 2-ER-189 (the document in SWC's opposition "always indicated that we were examining both *Ark* and *Atlas*"). SWC was entitled to assert its *Ark* copyrights to put a stop to Angela's infringement of code that appears in both *Ark* and *Atlas*. *See* 2 Melvile B. Nimmer & David Nimmer, Nimmer on Copyright, § 7.16[B][5][b] (2021 ed.) ("Given that a derivative work by definition consists of matter that would be infringing if it had been derived from the pre-existing work without the copyright proprietor's consent, it follows analytically that the owner of a registered underlying work, in that capacity alone, should be able to maintain such a suit. So long as the infringement relates to material common to both the underlying and derivative work, the copyright owner can simply allege violation of the former." (citation omitted)).

Further, to the extent that Angela may complain about some subset of code that only appears in *Atlas* (and which is not identified in Angela's papers) SWC has also asserted federal and state claims for Angela's misappropriation of trade secrets in SWC's code. As explained in SWC's papers (and not disputed by Angela below), SWC took precautions to protect its valuable source code. SWC required its employees to sign employment contracts in which they promised to maintain the source code in confidence. SWC also stored the source code on a

secure server that could be accessed by only those employees who were given login credentials. 2-ER-278; 3-ER-314-23. The district court took note of SWC's trade secret arguments, and stated that the "key issue" for *both* the copyright-infringement and the trade-secret-misappropriation claims is whether *MoE* "includes source code copied from" *Ark*, and based its ruling on both claims. 1-ER-14-17. Thus any code found only in *Atlas* is at issue in connection with SWC's trade secret claims. For the sake of simplicity, and to fully embrace SWC's trade secret claims in addition to its copyright claims, references in this brief to *Ark* source code should be understood to encompass the *Atlas* code as well.

## B. Former SWC employees went to Angela and released *MoE*

Angela is a video game developer. Imperium is Angela's indirect corporate parent. 9-ER-1998. They began developing *MoE* in 2018, purporting to spend at least $9 million to do so. *Id.*

According to Angela, Imperium and Valve entered into a distribution agreement on July 5, 2020, though that agreement is not in the record. On November 18, 2021, Valve began selling *MoE* to the general public on its Steam platform.[2] 9-ER-1999.

Around the time when Angela claims to have started its development of

---

[2] Angela mentions that it demonstrated a pre-release version at the "China Joy" trade show in July 2020 and July 2021. Br. at 4-5. The significance of that fact is not clear, but it was not a broad "public unveiling" of the game. *Id.* at 4.

*MoE*, one of Snail's parent company's top employees, its Technology Center director named Yang Li Ping, left the company. Later that month in April 2019, Yang began working for Angela. 2-ER-279; 6-ER-1270; 5-ER-1171.

Before his 2019 departure, Yang had access to the *Ark* source code and had copied it. In 2016 he copied the code to his laptop. 2-ER-279. In late 2018, Snail USA's CEO, Jim Tsai, asked Snail Games employee to give Yang access credentials to the *Ark* code to create a backup in the event of possible server failures. 2-ER-279; 6-ER-1271, 1304-07. Yang confirmed that he downloaded *Ark*'s source code. 6-ER-1304.[3] Yang had access to the most updated version of the source code from any device that could connect to the server and display the code, as well as from his personal workstation in China. 2-ER-280. He also had multiple ways to transfer the source code from a device—without alerting Wildcard or Snail USA. 2-ER-281-82.

Yang was not the only former SWC employee who joined Angela around the time Angela started developing *MoE*: around 60 of the 82 Angela employees listed on *MoE*'s credits were former employees of Snail Games. 6-ER-1228, 1270. Many had left Snail Games in 2019 and 2020 to join Angela.

---

[3] Angela submitted declarations from Yang in which he denied that he ever "transferred or communicated" a copy of the *Ark* source code. 2-ER-114; 5-ER-1172. The district court did not find that assertion credible in light of the documentary evidence in which Yang stated that he had "completed downloading" *Ark*'s code when asked by Snail to do so. 1-ER-17.

### C. SWC discovered massive source code overlap between the games

Right after Angela released *MoE* on Steam in November 2021, SWC became concerned that Angela had used SWC's source code to create *MoE*. 2-ER-173-75. Wildcard immediately compared *MoE*'s code to *Ark's* code. 2-ER-175-76; 2-ER-201. Because Wildcard did not have full access to *MoE*'s source code, Wildcard primarily focused on the "header" codes. 2-ER-175-76. The comparison revealed that *MoE*'s header code includes "hundreds of variables, classes, and functions that appeared to match up to *Ark*'s own data structures nearly one-to-one," and that "[t]hese structures had matching names and data types, with minimal-to-no-changes." 2-ER-176, 207-219. In the ensuing weeks, SWC identified nearly 600 other similarities between the code. 2-ER-178.

These similarities could not have been coincidental. *MoE* contains code made up of long strings of arbitrary words that were identical or nearly identical to strings and words in *Ark*. For instance, both games use the following identical word strings that perform the same respective functions:

> "bOnlyUseExpireTimeMultipliersIfActivated" and
> "SpawnInventoryOnDestructionLifeSpan."

7-ER-1708. There were also nearly identical strings in the two games, such as:

> *Ark*'s string: "bOnlyFoundationIfSnappedToFoundation,"
> *MoE*'s string: "bOnlyFoundationWhenBindedToFoundation."

2-ER-194.[4]

Given these remarkable similarities in the organization and types of content, Wildcard suspected that Angela had copied its code. 2-ER-176. Wildcard began a "disassembly" analysis to compare *Ark's* functional, executable code to *MoE's*. *Id.* SWC again saw similarities that could not be explained by the fact that both games used the same third-party "engine" or anything other than flagrant copying. *Id.*[5]

Wildcard uncovered other evidence of copying. Wildcard found that *MoE* contains non-functional human-written "log messages," such as notes by *Ark* programmers, and other arbitrary lines of text from *Ark* in *MoE*'s functional code. 6-ER-1227. For instance, Wildcard found the following matching message in both games: "BattleyeServer_Tick() FAILED server rechecking BattleyeServer _IsEnabled … mem corruption?" 6-ER-1253, 1338. Unless *Ark*'s code had been incorporated into *MoE*'s code, this message would not appear in *MoE*'s code.

---

[4] Angela claims that these similarities should be discarded as unprotectable elements. Br. at 17. SWC disagrees. But even if they were unprotectable, that hundreds of identical or near-identical arbitrary headers appear in both games is, at the least, probative of the fact that Angela actually copied *Ark*. These probative— rather than substantial—similarities disprove that the similarities are due to mere coincidences, and they may be proven with unprotectable elements. *See Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020).

[5] The appearance in *MoE* of non-functional code specific to *Ark* cannot be explained by the fact that these games feature similar game play. Wildcard had performed similar comparisons with another game in the genre and found no overlap like the ones with *MoE*. 2-ER-174, 177. Nor can the similarities be explained—as Angela argues—by the fact that both games were built on top of Unreal Engine 4 ("UE4"), licensed from Epic Games. Br. at 14-15. SWC's comparisons filtered out code attributable to UE4. 2-ER-185-86, 197-98; 6-ER-1226-27.

Based its investigation, SWC believed that Angela had built *MoE* using source code it stole from SWC.

Then came outside, independent confirmation. Bastian Suter is the CEO of BattlEye Innovations e.K., a German company that creates the eponymous anti-cheat software—"BattlEye"—for online multiplayer games. 6-ER-1310. BattlEye blocks game players from using third-party tools to get unfair advantages by modifying (that is, using a cheat) in a game. *Id.* Suter has provided this anti-cheat software for *Ark* and *MoE*. *Id.*; 2-ER-143.

Suter is not an employee of Wildcard, Snail USA, or Snail Games, and he has no financial interest in the parties' dispute or the games. 2-ER-141. Yet after hearing about the source code dispute concerning *Ark* and *MoE*, on December 9, 2021, Suter investigated whether *MoE* contained *Ark*'s source code. 6-ER-1310. He concluded that it did. 2-ER-142-43.

Suter found *Ark*'s "BattlEye integration code" in *MoE*. 6-ER-1311. He was puzzled. Each game that uses BattlEye must include an "integration code," which helps BattlEye work with the developer's game. *Id.*; 2-ER-142. Importantly, this code is unique to each game, and Wildcard—not BattlEye—wrote the integration code strings for *Ark*. 2-ER-143; 6-ER-1311.[6] *Ark*'s integration code is not

---

[6] Angela does not dispute that there is an overlap of BattlEye integration code in the two games. Br. at 20. And because the overlap is with this game-specific code and not generally with "a common third-party 'anti-cheat' software product called

publicly-available, and Suter confirmed that he never shared *Ark*'s integration code with the *MoE* developers. 6-ER-1311. Thus, *Ark*'s integration code should not be found in *MoE* unless there was copying. *Id.* Suter detected unique strings used for *Ark*'s BattlEye integration code in *MoE*. *Id.* These strings were either identical (down to formatting, capitalization, or included typos such as "recieve" instead of "receive") or nearly identical (such as changing "BattlEye" to "BatEye"). *Id.* Suter concluded "that the developers of … [*MoE*] copied source code from Wildcard's game ... [*Ark*]." 2-ER-141.

SWC also engaged a third-party expert, Christopher Rucinski, who found, even without access to Angela's native code, that "[t]he extent of similarities already identified [by Wildcard] … raises serious concerns that computer code for [*MoE*] was copied from computer source code for… Wildcard software products." 6-ER-1349. SWC then attempted to work with Angela to conduct a complete code review by a neutral code expert to determine the full scope of copying.

SWC did not have such luck with Angela. Though Angela aggressively disclaims that it copied SWC's code, Angela repeatedly stalled and rejected proposals to have a neutral third party conduct a code review. 3-ER-333-35, 344-429. Meanwhile, Angela claims here that SWC has refused to make ***its*** source

---

'BattlEye,'" the overlap cannot be "consistent with [*MoE*] having been independently created …." *Id.*

code available for expert review. *E.g.*, Br. at 9-10, 16-17. Not true. SWC initiated the request to Angela for a code review on December 10, 2021, the day after Angela filed this lawsuit. 3-ER-345-50. Angela obstructed the review, including by attempting to limit the comparison to just five modules, insisting on using an academic tool that is not used in the industry and that would miss key similarities probative of copying, and throwing other hurdles in the path of a neutral code review. 2-ER-152-56; 3-ER-333-35, 344-353, 403-429. Over Angela's objections to having a neutral party review the code (*see, e.g.*, *id.*), after denying Angela's injunction the district court appointed a neutral code expert pursuant to Fed. R. Evid. 702.

SWC has also uncovered that, when Angela was refusing to share its infringing code, Angela was wiping numerous hallmarks of copying from its code. 6-ER-1228-29. SWC could detect this because Angela was issuing public updates of its game. *Id.* For example, Angela removed a class called "AGStructureWaterPipe" in the *MoE* code, which looked like a copy of "APrimalStructureWaterPipe" from the *Ark* code. 6-ER-1229. This removal was noteworthy because the "AGStructureWaterPipe" code lacked any function in *MoE*. *Id.* Thus, removing that code would make Angela's copying less obvious while not affecting the game's performance. *Id.*

16

### D. Valve decided to take down *MoE* from Steam after receiving SWC's DMCA takedown notice

Based on the results of the initial code comparison, SWC sent DMCA takedown notices to the services that were selling or hosting *MoE*. 6-ER-1228. SWC stated that it believed that *MoE* infringed SWC's source code and requested that they take down *MoE*. *E.g.*, 6-ER-1408-23. The takedown notice appended an 11-page side-by-side comparison of the *Ark* and *MoE* code.[7] *E.g.*, 6-ER-1412-23. SWC issued such a takedown notice to Valve on December 1, 2021. 6-ER-1408-23. On December 4, 2021, Valve decided to stop selling *MoE* on Steam and notified SWC and Angela of its decision. 8-ER-1914.

On December 4, 2021, SWC sent a DMCA notice to Tencent Cloud LLC ("Tencent"). 7-ER-1486-88, 1721. Unlike Valve, Tencent chose not to take the game down from its servers, 7-ER-1722, so *MoE* users continue to play the infringing game (and not play SWC's or any other competing games) and the game continues to generate revenue from in-game sales. Angela also sells *MoE* on its own website. 3-ER-336, 431-33. *MoE* has not been removed from the market.

---

[7] Angela does not dispute that SWC provided the results of the initial code analysis with its DMCA notices. It claims, however, that the code analysis "consist[s] of literally fabricated, non-existent sequences of C++ function and variable names." Br. at 7, 9. Not so. SWC never claimed that what was copied were the specific "sequences" or the ordering of the code; rather, as the extensive evidence SWC offered show, Angela copied the code's content and even admitted that at least 4,800 lines of code overlaps substantially with SWC's code. 2-ER-125.

Despite Angela's claim that its business has been devastated by Valve's removal of *MoE*, Angela took one week (until December 10, 2021) to send Valve a one-page DMCA counter-notification. 9-ER-2023-47. The counter-notification stated that on the day before issuing the counter-notification (December 9, 2021), Angela had filed a complaint in the Central District of California, against SWC, alleging three claims for relief: (1) a request for declaratory judgment of non-infringement of copyrights; (2) a request for declaratory judgment of non-misappropriation of trade secrets; and (3) a claim under the DMCA (section 512(f)) that SWC had made knowing, material misrepresentations in its takedown notice. 9-ER-2103-06, 2023. Angela did not assert a contract interference claim against SWC, or any claim against Valve. Notwithstanding Angela's counter-notification, Valve chose to keep *MoE* off of its service. 6-ER-1207.

On December 20, 2021, SWC answered the complaint, filed counterclaims against Angela, and filed a third-party complaint against Tencent. 7-ER-1691-92. SWC's counterclaims against Angela allege: direct, vicarious, and contributory copyright infringement, as well as misappropriation of trade secrets under both the Defend Trade Secrets Act, 18 U.S.C. § 1836, and the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq. 7-ER-1710-18. SWC requested that "Angela, Imperium, and all of their affiliates … be preliminarily and permanently enjoined from directly or indirectly infringing Snail Game's copyrighted source

18

code for *Ark: Survival Evolved* …." 7-ER-1719-2.  Because Tencent refused to remove *MoE*, SWC filed a third-party complaint against Tencent for direct, vicarious, and contributory copyright infringement.  7-ER-1720-27.

### E.     The district court declined to require SWC to withdraw its DMCA takedown notices to Valve and other services

On December 17, 2021, Angela filed an *ex parte* application for a temporary restraining order and order to show cause re: preliminary injunction.  8-ER-1904-22.  Angela asked the court to order SWC to withdraw its DMCA takedown notices to Valve and others, and to "refrain from any further attempts to induce third-parties to breach contractual obligations owed to" Angela.  8-ER-1905.

The district court denied Angela's TRO application on December 23, 2021.  5-ER-1156-62.  After additional briefing and oral argument, on January 31, 2022, the district court denied Angela's request for preliminary injunction.  1-ER-21.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion or make legal error in denying Angela's request for a mandatory preliminary injunction.  The district court considered and made findings on each of the four *Winter* factors and properly concluded that Angela failed to show that it was entitled to that relief.

On appeal, Angela fails to show that the district court's findings on these factors were erroneous.  Rather, Angela argues that this Court should rewrite section 512 in ways that turn the DMCA notice provisions upside down, contrary

19

to Congress's enacted policy preferences. Angela also asks this Court to conclude, contrary established case law, that Angela did not have to show it was entitled to a preliminary injunction, even though it was the moving party. Finally, Angela asks this Court to conclude, contrary to precedent, that requiring SWC to take action to withdraw its takedown notices is not a mandatory injunction.

None of Angela's arguments is sound:

1.      The fact that section 512 creates safe harbors that service providers like Valve can accept or ignore creates an insurmountable standing hurdle for Angela. Angela's alleged injury is that its game, *MoE*, is no longer on Valve's Steam platform. That injury is not redressable by SWC's withdrawal of its takedown notice. No order requiring SWC's notice controls Valve's action. Valve can choose to keep *MoE* off of Steam based merely on SWC's filing of its claims against Angela. Because Angela cannot establish the redressability element of constitutional standing, this Court must dismiss the appeal. *See* Section I.

2.      Turning to the merits of Angela's motion for a preliminary injunction, Angela misreads section 512, and on that basis, asks this Court to adopt a made-up reading of the statute. Angela interprets section 512 as providing a *non-judicial* preliminary injunction to copyright owners that invoke its notice-and-takedown procedure. Based on the flawed premise, Angela argues that section 512(c) requires a copyright holder to prove its entitlement to the takedown. Section 512

does no such thing. It provides safe harbors for service providers to opt into. Angela also contends that section 512(g) mandates the restoration of the taken-down work unless a copyright holder obtains a preliminary injunction from a district court enjoining the subscriber—the party in Angela's shoes. Section 512(g) says the opposite. It says to keep the infringing material off the Internet if a copyright holder files an infringement claim against the subscriber and seeks injunctive relief, which SWC did here. Nothing in section 512(j) governs what happens in that infringement suit against the **subscriber** (Angela) or how the safe harbor operates. Section 512(j) deals with a suit against the **service provider** (Valve) who has already entered the safe harbor. There is no basis to rewrite the DMCA, upend Congress's policy decisions on the prevention of online piracy, or adopt Angela's other arguments. *See* Section II.

3. The district court's holding that Angela, as the party seeking preliminary relief, must establish each of the *Winters* factors is consistent with both the Supreme Court and this Court's precedent. The district court's conclusion that Angela is seeking a mandatory injunction and thus must show that the law and facts "clearly favor" its position is also correct. *See* Section III.

4. Angela cannot justify an entitlement to the mandatory injunctive relief it seeks, under either the prohibitory or the mandatory injunction standard. As the district court found, Angela's dearth of evidence on the declaratory judgment

claims it asserted in this case—particularly in contrast to SWC's evidence—showed that Angela had failed to establish its likelihood of success on the merits of its claims, much less that the law and facts clearly favor Angela's position. The district court also did not abuse its discretion concluding that none of the other *Winter* factors supported an injunction. *See* Section IV.

## STANDARD OF REVIEW

This Court reviews the "district court's order denying [Angela's] motion for a preliminary injunction … for abuse of discretion." *Garcia v. Google, Inc.*, 786 F.3d 733, 739 (9th Cir. 2015). This Court may reverse "only where [the district court] relied on an erroneous legal premise or abused its discretion," because the decision "lies within the discretion of the district court." *DISH Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011). This Court "will not reverse the district court where it got the law right, even if [it] would have arrived at a different result, so long as the district court did not clearly err in its factual determinations." *Garcia*, 786 F.3d at 739 (internal quotation marks and citation omitted).

Angela claims that the standard of review is *de novo* because this Court is being asked to review an interpretation of a statute. Br. at 25. But because Angela never presented that argument to the district court, there is no statutory-interpretation ruling for this Court to review under the *de novo* standard.

## **ARGUMENT**

## I.  THE COURT SHOULD DISMISS THE APPEAL BECAUSE ANGELA LACKS STANDING

This Court has "an independent duty to assure that standing exists, irrespective of whether the parties challenge it." *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013).  That duty persists even where the district court had not ruled on standing, *see City of S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 625 F.2d 231, 233 (9th Cir. 1980), and where the standing issue was raised for the first time on appeal, because "a jurisdictional defect is a non-waivable challenge that may be raised at any time during the proceeding, including on appeal," *Bellon*, 732 F.3d at 1138-39.

"In order to invoke the jurisdiction of the federal courts, a plaintiff must establish 'the irreducible constitutional minimum of standing,'" *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Angela must "demonstrate standing ... for [the] form of relief that is sought," *i.e.*, a preliminary injunction.  *Davis v. Fed. Election Comm'n* , 554 U.S. 724, 734 (2008) (internal quotation marks and citations omitted).  Because a plaintiff must establish standing "with the manner and degree of evidence required at the successive stages of the litigation," *see Lujan*, 540 U.S. at 561, at the preliminary injunction stage, Angela must make a "clear showing" of each of the following elements of Article III standing: (1) its injury-in-fact; (2) "a

causal connection between the injury and the conduct complained of"; and (3) "that the injury will likely be redressed by a favorable decision." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013). Angela cannot do so for at least the third element of standing—redressability.

Redressability means that, if this Court is "unable to grant the relief that relates to the harm, the plaintiff lacks standing." *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982). To demonstrate redressability, Angela must establish "a substantial likelihood that the requested relief will remedy the alleged injury in fact." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). This rule presents an insurmountable hurdle for Angela.

Angela's alleged injury is that the removal of its game from Valve's platform resulted in loss of sales and other economic harm. 8-ER-1915. To remedy that injury, Angela asks the court to "immediately order [SWC] to withdraw the 'take down' notices they have issued to Valve and other Plaintiffs' service providers …." 8-ER-1914. That remedy, however, is untethered to the injury-in-fact because, even if the Court grants that it and orders SWC to withdraw its takedown notices, Angela's injury cannot be remedied unless and until Valve restores the game.

As Angela acknowledges, it is up to Valve, not SWC, to decide whether to restore *MoE* to its platform. 8-ER-1912 (noting that "Valve refused" to restore the

game).  It was Valve's choice to take down *MoE* and it is free to continue to do so, even if there is no pending takedown notice from SWC.  Valve can decide to keep its platform free of *MoE* if, for example, it suspects, based on its own investigation or otherwise, that *MoE* is an infringing game.  Or Valve may determine that *MoE* violates Valve's user or distribution agreement with Imperium and for that reason, having nothing to do with SWC's takedown notice, decline to restore the game. Angela did not put evidence in the record that Valve would restore the game but for SWC's takedown notice.

That defeats Angela's standing.  "There is no standing if, following a favorable decision, whether the injury would be redressed would still depend on the unfettered choices made by independent actors not before the courts." *Novak v. United States*, 795 F.3d 1012, 1020 (9th Cir. 2015) (internal quotation marks and citation omitted).  Valve is not a party to this suit and cannot be ordered by the Court to restore the game.  *See Yazzie v. Hobbs*, 977 F.3d 964, 967-68 (9th Cir. 2020) (concluding that the plaintiffs did not establish the redressability element of standing where their "relief will … depend on the act of a third party who is not controlled or bound by a favorable ruling in this court").

"Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).  Because the Court does not have "the power to right … the claimed

injury," Angela lacks standing. *See Ry. Labor Execs. Ass'n v. Dole*, 760 F.2d 1021, 1023 (9th Cir. 1985) (citation omitted). The Court should dismiss Angela's appeal. *See Yazzie*, 977 F.3d at 966 (declining to review the district court's preliminary injunction analysis because the plaintiffs lacked standing).

## II. THE COURT SHOULD REJECT ANGELA'S MADE-UP INTERPRETATION OF SECTION 512

Angela argues for the first time on appeal that subsections (c), (g), and (j) of Section 512 mandates the restoration of its game on Valve's platform, unless SWC proves to a district court, under a preliminary injunction standard, that it is entitled to the removal. *See* Br. at 22, 27, 29-30. Angela turns section 512 on its head. The statute makes it clear that the service provider, Valve, would have lost its safe harbor if it restored Angela's game. That is because SWC followed the procedure set forth under the statute and filed a claim for copyright infringement that sought injunctive relief to prevent Angela from infringing SWC's copyrighted source code. *See* 7-ER-1719-20.

### A. Section 512(c) does not require a copyright owner to prove its entitlement to a takedown of the infringing material

Angela is no doubt unhappy that Valve took down Angela's game in response to SWC's notice. And Angela likely thinks SWC should do more to obtain what it views as a *de facto* preliminary injunction. Br. at 32. To make that argument stick, Angela presents a convoluted reading of section 512, based on an

erroneous premise about what it does. According to Angela, the procedure for taking down an infringing work hosted by a third party, as outlined in section 512(c), is akin to an award of a *non-judicial* preliminary injunction to the copyright owner. Br. at 23. On that false premise, Angela concludes that the district court erred by not requiring SWC to prove its entitlement, under the preliminary junction standard, to have served that takedown notice. *Id.* There is no support for Angela's argument. Section 512 does not provide a right of action or remedies to a copyright holder; it only sets up safe harbors for service providers, who are not required to take any action until a copyright holder alerts them of infringement in a DMCA notice.

One of Congress's goals in enacting the DMCA in 1998 was "to update domestic copyright law for the online world." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (citation omitted). Congress was concerned about the potential for massive copyright infringement on the Internet, *see* S. Rep. No. 105-190, at 10 (1998) ("copyright industries are one of America's largest and fastest growing economic assets"), but was also concerned that exposing service providers to unbounded liability for such infringement would chill valuable innovation of online services, *see id.* at 8 ("[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability"); *see also UMG Recordings, Inc. v. Shelter Capital Partners*

*LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (Congress was "loath to permit the specter of liability to chill innovation that could also serve substantial socially beneficial functions" that service providers could provide and prevented that by enacting section 512). Congress thus provided four safe harbors for qualified service providers against liability for money damages for infringement, as detailed in section 512, or Title II of the DMCA. *See* S. Rep. 105-190, at 20 (1998) (Congress aimed to provide "greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities"). At issue in this case is the safe harbor provided in section 512(c), which limits liability for copyright infringement "by reason of the storage … of material that resides on a system or network controlled or operated by or for the service provider," where that storage is "at the direction of the user."

To take advantage of the safe harbor, the service provider must follow the notice-and-takedown (section 512(c)) as well as the put-back (section 512(g)) procedures. One such requirement is that a service provider expeditiously remove the infringing content that had been identified in takedown notice. Section 512(c)(1)(C); *see Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 604 (9th Cir. 2018) ("the service provider, to maintain its shield, must respond expeditiously and effectively to the policing" of infringement).

28

It is not correct, as Angela claims, that SWC or any other copyright holder has "a claim of right to immediate relief" that it can assert by sending a DMCA takedown notice. Br. at 25. This assertion rests on a flawed premise that section 512(c) *mandates* action from service providers. It does not. Although the safe harbor *incentivizes* a service provider to quickly remove infringing content, the statute does not require it. *See Stardock Sys., Inc. v. Reiche*, 2018 WL 7348858, at *9 (N.D. Cal. Dec. 27, 2018) ("the DMCA notice and takedown process is not tantamount to an injunction" because the "receipt of a notice of claimed infringement does not mandate" but only "*incentivizes* service providers to remove infringing material" (citing *Rossi v. Motion Picture Ass'n of America Inc.*, 391 F.3d 1000, 1003 (9th Cir. 2004)). The copyright holder "cannot 'unilaterally' block [the accused content] or any other content from distribution by issuing a DMCA notice." *Id.*

Section 512(c) makes it clear that the safe harbor works by requiring the service holder to quickly remove the infringing content without further proof from the copyright owner, so long as the notice is valid. Section 512(c)(3)(A) sets forth requirements for a valid and effective notice, including requiring an "identification of the copyrighted work, identification of the allegedly infringing material, and, critically, a statement that the copyright holder believes in good faith the infringing

material 'is not authorized by the copyright owner, its agent, or the law.'" *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1151 (9th Cir. 2016) (citation omitted).

There is no dispute that SWC met these requirements. *See* 6-ER-1408-23.[8] Nothing in the statue requires SWC, after providing a valid takedown notice, to "prov[e] entitlement to *pretrial* relief demanded under 17 U.S.C. 512(c)" in a later district court proceeding. Br. at 28.

**B.** **Section 512(g) requires the service provider to continue to keep the infringing material taken down, if a copyright owner seeks a court order to restrain the user from copyright infringement**

Angela is also wrong that section 512(g), which explains what happens if the subscriber whose material was taken down pursuant to a DMCA notice contests that decision, mandates the restoration of the material unless the copyright holder obtains a preliminary injunction for the continued takedown of that material. Br. at 27, 30. According to Angela, upon the issuance of a counter notification by the subscriber, the service provider first "replaces or ceases disabling access to material," which triggers a copyright claimant's right to "then sue the alleged infringer" and obtain an injunction from "the service provider." Br. at 2. Angela reads the statute backwards. The statute says that the material stay offline, even if a counter notification had been issued, so long as the copyright owner files a

---

[8] Furthermore, though SWC was not required to do so, *see Rossi*, 391 F.3d at 1003, SWC provided an 11-page side-by-side code comparison to the service providers, detailing the hundreds of ways *MoE* infringed SWC's *Ark* source code.

copyright infringement claim against the subscriber that includes a request for injunctive relief against that subscriber. *See* section 512(g)(2)(B) & (C) (service provider cannot restore material if copyright holder gives notice that it "has filed an action seeking a court order to restrain the subscriber from engaging in infringing activity …."); *see also* Section 512(g)(4).

In section 512(g), Congress protected "the end-users['] legitimate interests in not having material removed without recourse,'" *Rossi*, 391 F.3d at 1003 (quoting S. Rep. No. 105-190 at 21 (1998)), but it is limited and does not triumph concerns for rapid removal of infringing material. Section 512(g) requires the service provider to promptly notify the accused user that the content it has uploaded has been identified as infringing in a DMCA notice and was taken down. Section 512(g)(2)(A). This notice gives the affected subscriber a chance to submit a counter notification requesting that the material be put back. Section 512(g)(3); *see also Curtis v. Shinsachi Pharm. Inc.*, 451 F. Supp. 3d 1190, 1205 (C.D. Cal. 2014) ("the accused infringer has the ability to require the service provider to restore the information by sending a counter-notice" (citation omitted)).

Within 10 to 14 business days of receiving a counter-notification, the service provider must replace or restore access to the allegedly infringing material that was taken down *if* there is no further action from the copyright owner. But the service provider cannot restore that material if the copyright owner has notified the service

31

provider that it has filed a complaint "seeking a court order to restrain the subscriber from engaging in infringing activity …." Section 512(g)(2)(B), (C); *see* Section 512(g)(4).

Angela issued a counter notification on December 10, 2021. 9-ER-2023-47. On December 20, 2021, within the 10 to 14 business days, SWC filed its counterclaims for copyright infringement against Angela and asking "Angela, Imperium, and all of their affiliates … be preliminarily and permanently enjoined from directly or indirectly infringing Snail Game's copyrighted source code." 7-ER-1719-20.[9] Valve kept Angela's game taken down. Angela does not dispute that SWC's complaint seeks injunctive relief against Angela's infringement. *See* Br. at 11, 28 (SWC "filed a counterclaim that 'requested' that Plaintiffs 'be preliminarily and permanently enjoined from directly or indirectly infringing'").

Angela claims, however, that section 512(g)(2)(C) requires more than merely praying for such relief; it requires SWC to have immediately moved for a preliminary injunction against Angela's acts of infringement. Br. at 30. But Congress did not require that. And Angela's strained reading of this subsection as imposing such a requirement is unsupported by the text of section 512 and runs headlong into this Court's decision that the language under section 512(g) is

---

[9] SWC did not have to "file[] an action"; Angela had already initiated suit asserting declaratory judgment of non-infringement on December 9, 2020. 9-ER-2102.

satisfied by the copyright holder's filing of an infringement suit in the district court. *See, e.g.*, *Lenz*, 815 F.3d at 1151 (under section 512(g) service provider need not restore content upon receipt of a counter notice if the copyright holder has "filed a lawsuit against the user seeking to restrain the user's infringing behavior" (citation omitted)).

Section 512(g) places no restriction on the type of "order to restrain" that may be sought by the copyright holder. Again, if Congress intended to limit the provision to an order for preliminary injunction, it would have said so. Angela's interpretation—premising the continued takedown of the infringing material on the copyright owner first obtaining a preliminary injunction—"would have [this Court] read an absent word into the statute," but, "[w]ith a plain, nonabsurd meaning in view, [this Court] need not proceed in this way." *Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004); *see also UMG Recordings*, 718 F.3d at 1019 (9th Cir. 2013) ("Had Congress intended to include such a limitation [to section 512(c)], it would have said so expressly and unambiguously" (citation omitted)).

Angela provides no support for its proposed DMCA overhaul. Angela can point only to section 512(g)(3)'s requirement that a counter notification contain a statement that the subscriber consents to a jurisdiction in the United States. Br. at 27, 30. At most, that makes it ***possible*** for a copyright owner to seek a preliminary injunction. It in no way states that the infringing content must be restored unless a

copyright owner moves for a preliminary injunction. Nothing in section 512(g)(3)(C) or the rest of section 512 requires the copyright owner to seek a preliminary injunction.

When this Court has interpreted other parts of section 512, it has ***always*** declined to read an extra limitation into it, absent express language. *See, e.g.*, *UMG Recordings*, 718 F.3d at 1019 (declining to read a limitation into section 512(c) and explaining that "if Congress wanted to confine § 512(c) exclusively to web hosts rather than reach a wider range of service providers, …. [w]e presume that Congress instead would have taken the more straightforward course of clarifying in the definition of 'service provider' that, as it applies to § 512(c), only web hosts qualify."); *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1042 (9th Cir. 2013) ("we will not read requirements into the safe harbors [in section 512] that are not contained in the text of the statute" (citation omitted)). It should decline to do so here.

Reading sections 512(c) and (g) together, it is clear that Congress decided that if a copyright owner promptly files a lawsuit for infringement, and the complaint requests an injunction, the third party that hosts that material online has to pull down and keep the material down unless it is willing to risk having to pay damages to the copyright owner. *See, e.g.*, Section 512(g)(4). That is the balance Congress drew in consideration of the competing interests among "copyright

holders in benefitting from their labor; … entrepreneurs in having the latitude to invent new technologies without fear of being held liable if their innovations are used by others in unintended infringing ways; and those of the public in having access [to] both …." *Marvix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1051 (9th Cir. 2017) (quoting *Fung*, 710 F.3d at 1037). Angela's outrage over this process does not translate into an error of the district court, or empower this Court to rewrite the DMCA in a way Congress chose not to.

Ultimately, Angela's dispute is with Congress, not SWC or the district court. Congress grappled with "[d]ifficult and controversial questions of copyright liability in the online world" when it enacted section 512, *Ellison*, 357 F.3d at 1076, and provided a "carefully considered protocol," *UMG Recordings*, 718 F.3d at 1018, that reflects its policy decisions concerning online piracy. This protocol, now in effect for nearly 25 years, has provided a safe harbor from monetary liability for copyright infringement for user-uploaded content to services like YouTube, Facebook, eBay, and Amazon, making possible the creation and continued vitality of these online platforms.[10] Whether this protocol should be modified to be more infringer-friendly is a matter for Congress, not this Court, to

---

[10] *See Viacom Int'l Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110, 123 (S.D.N.Y. 2013) (YouTube); *Long v. Dorset*, 369 F. Supp. 3d 939, 947 (N.D. Cal. 2019), aff'd, 854 F. App'x 861 (Facebook); *Hendrickson v. Ebay, Inc.*, 165 F. Supp. 2d 1082, 1094 (C.D. Cal. 2001) (eBay); *Hendrickson v. Amazon.Com, Inc.*, 298 F. Supp. 2d 914, 918 (C.D. Cal. 2003) (Amazon).

decide. *See Ventura Content*, 885 F.3d at 612 ("Congress, not judges, makes the policy decision" regarding section 512).

### C.    Section 512(j) does not support Angela's fictitious DMCA reading

Angela argues that section 512(j) requires the restoration of the infringing work unless SWC moves for a preliminary injunction.  Br. at 27-30.  But section 512(j) has nothing to do with this lawsuit, with the preliminary injunction Angela sought, or the district court's adjudication of Angela's motion.

As Angela recognizes, section 512(g)(2)(C) concerns a court order to restrain the **subscriber** (here, Angela) from engaging in infringing activity.  Br. at 30.  Section 512(j) refers to a different kind of action: one that may be brought against a **service provider** (here, Valve) who otherwise satisfies the damages safe harbor.  Hence, section 512(j) refers to a court order to restrain the **service provider** and is irrelevant to what obligations, if any, a copyright holder has as to its claims against the subscriber.

However, section 512(j) makes plain that Congress gave significant thought to injunctive relief.  Yet, it is telling that section 512(j) provides no injunctive remedy requiring a copyright holder to retract a takedown notice.  Indeed, there is **not a single word** about the kind of injunction Angela sought in all of section 512.  That is because Congress did not enact any such requirement.

Instead, Congress went the other way. It limited recovery for an erroneous takedown notice to an action for monetary relief for knowing, material misrepresentations. *See* Section 512(f); *Lenz*, 815 F.3d at 1151 ("If an entity abuses the DMCA, it may be subject to liability under § 512(f)."). Congress wanted to prioritize the quick removal of infringing material, even at the risk of mistaken takedown notices. In the face of these provisions, Angela is asking the Court to pretend that Congress intended but was too inept to have included such a provision. The Court should not oblige.

## III. THE DISTRICT COURT CORRECTLY CONCLUDED THAT ANGELA, AS THE MOVANT SEEKING A MANDATORY INJUNCTION, HAD THE BURDEN OF PROVING THAT THE *WINTER* FACTORS "CLEARLY FAVOR" THE RELIEF

### A. Angela—not SWC—must establish each of the four *Winter* factors to obtain preliminary relief

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). The district court should enter a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22 (citation omitted). Hence, it is incumbent on the movant to show that it is entitled to a preliminary injunction and to "show[] that (1) it is 'likely to succeed on the merits,' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [its] favor,' and (4) 'an injunction is in the public

interest.'" *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at 20). Alternatively, the movant can show that "serious questions going to the merits and a hardship balance that tips sharply toward the [movant] … support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (internal quotation marks omitted).

This Court has reiterated that the party seeking a preliminary injunction must establish each of the *Winter* factors. *See DISH Network Corp*, 653 F.3d at 776 ("To warrant a preliminary injunction, [the movant] must demonstrate that it meets all four of the elements of the preliminary injunction test established in [*Winter*] …."); *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980) (noting "the moving party's burden to show the possibility of irreparable injury to itself and the probability of success on the merits" (citations omitted)). In light of this well-established precedent, the district court correctly required Angela to make a sufficient showing as to all four *Winter* prongs to establish that it was entitled to the requested relief. 1-ER-12-13.

That Angela has asserted claims for declaratory judgment does not change the legal standard for seeking a preliminary injunction. Indeed, the party seeking the injunctive relief in *Winter*, like Angela, was also seeking declaratory relief but that did not shift the burden to the non-moving party. 555 U.S. at 16, 20. Other

courts have applied the same principle. *See Net Connection Hayward, LLC v. City of Hayward*, 2013 WL 3786635, at *12 (N.D. Cal. July 18, 2013) ("In considering Plaintiff's declaratory relief at the preliminary injunction stage, the Court must consider whether Plaintiff's argument on this point satisfies the *Winter* factors, as modified by the Ninth Circuit."); *English v. Ryland Mortg. Co.*, 2016 WL 6820365, at *3 (D. Md. Nov. 16. 2016) (placing the burden of establishing the four *Winter* factor on the movant who requested declaratory relief).

Nor does the ultimate burden of proof on the merits of the pending copyright infringement and the trade secrets misappropriation claims affect the burden of establishing an entitlement to a preliminary injunction. *Medtronic Inc. v. Mirowski Family Ventures, LLC*, held only that the owner of intellectual property must prove infringement to obtain a ***final judgment*** against an infringer. 571 U.S. 191, 198 (2014). Neither SWC nor the district court took issue with the proposition that SWC will ultimately need to prove that Angela infringed SWC's copyright and misappropriated SWC's trade secrets.[11] But as the district court correctly noted, *see* 1-ER-12-13, the Supreme Court in *Medtronic* did not examine or overturn the

---

[11] Angela takes issue with the fact that this ultimate burden does nothing to help Angela get what it wants—the restoration of *MoE* on Valve's platform—supposedly until "a trial is had." Br. at 2; *see also id.* at 3, 26, 28. This is an exaggeration and not based any distinction the trial court made between pre-trial vs post-trial relief. The district court did not hold that, under *Medtronic* or otherwise, a copyright owner is absolved of proving its claims until there is a trial. SWC will bear the appropriate burden at, for example, the summary-judgment stage.

burden-of-proof for preliminary relief in *Winter*. *Medtronic* thus cannot stand for the proposition that SWC bore the burden of proof on Angela's motion.

Angela points to the fact that Congress intended section 512's "safe harbors" to be administered "under existing principles of law" to argue that, because SWC must ultimately prove its copyright infringement claim, it must also do so at the preliminary injunction stage because it invoked section 512's procedure before filing suit. Br. at 31-32. This is sophistry. Although section 512 does not alter the standard for liability, *see Ellison*, 357 F.3d at 1077 (noting that claims against service providers are "generally evaluated just as they would be in the non-online world"), this speaks only to what is required to prove "the question of ultimate liability under the various doctrines of direct, vicarious, and contributory liability," not the burden of proof for preliminary relief, *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007) (internal quotation marks and citation omitted).

## B. Because Angela requested a mandatory injunction, it must show that the law and facts clearly favor its position

Mandatory injunctions "go[] well beyond simply maintaining the status quo" and are "particularly disfavored." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (internal quotation marks and citation omitted). "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn Nutraceuticals, Inc. v. Mucos*

40

*Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal quotation marks and citation omitted).  Hence, when a party "seeks a mandatory injunction, she must establish the law and facts ***clearly favor*** her position, not simply that she is likely to succeed."  *Garcia*, 786 F.3d at 740 (emphasis added); *see also Stanley*, 13 F.3d at 1320 ("When a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party" (internal quotation marks and citation omitted)).

The district court correctly held that Angela's requested relief is a mandatory injunction and that Angela must establish that the law and facts "clearly favor" its position.  1-ER-12.  Mandatory injunctions "order[] a responsible party to 'take action.'"  *Garcia*, 786 F.3d at 740 (quoting *Marlyn Nutraceuticals*, 571 F.3d at 879).  Angela sought an order that SWC take action, to withdraw the takedown notices.  That is a mandatory injunction.

Angela attempts to recolor its injunction as having sought to only preserve the status quo.  According to Angela, the status quo is how the world looked when it placed *MoE* for sale on Valve's website.  Br. at 40, 42.  Not so.

That position is contradicted by the very case Angela relies on.  Br. at 40.  "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy."  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir.

2000) (internal quotation marks and citation omitted). This Court held in *GoTo.com* that the status quo is how the world existed before the alleged infringement began. *See id.* ("the status quo ante litem existed before Disney began using its allegedly infringing logo."); *see also Consumer Opinion LLC v. Frankfort News Corp.*, 2016 WL 6804607, at *3-4 (N.D. Cal. Nov. 17, 2016) (requiring defendant to withdraw DMCA notices was a mandatory injunction). Thus, the status quo is a world that existed before Angela began the acts of infringement, which is before Angela started selling the allegedly infringing game, *MoE*, on Steam.

Angela cites *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804 (9th Cir. 1963) but the case does not support Angela's position. Br. at 40. In *Tanner*, this Court concluded that preserving the status quo meant allowing Tanner to continue to operate as a licensee of Avis as it had for the previous several years, before the parties' dispute arose. *Tanner*, 316 F.3d at 809. Angela is not SWC's licensee; Angela is an alleged infringer to SWC. Hence there was no longstanding relationship that Angela relied on to preserve.

Angela's remaining arguments are strained and unpersuasive. Angela's injunction against SWC was not akin to an "anti-suit" injunction. Br. at 36, 39, 42. Those "allow the court to restrain a party subject to its jurisdiction from proceeding in a ***foreign court*** in circumstances that are unjust." *E. & J. Gallo Winery v.*

42

*Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006) (emphasis added). Angela does not explain how its request "involve[s] detailed analysis of international comity" that is the hallmark of an anti-suit injunction. *Id.* at 990.

Angela's preliminary injunction is also not one that is "necessary or appropriate in aid of [the court's] jurisdiction[]" under the All Writs Act, 28 U.S.C. § 1651(a). *See* Br. at 23, 37-39. Angela does not explain, as it must, how an injunction requiring SWC to withdraw its takedown notice is necessary to preserving the integrity of the district court's past, current, and future "exercise of jurisdiction otherwise obtained" to resolve the parties' disputes regarding copyright infringement, trade secrets misappropriation, or Angela's section 512(f) claim. *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977). Further, Angela never based its request for a preliminary injunction on "whether [SWC was] … entitled to the pretrial relief [it] had asserted under 17 U.S.C. § 512(c)," Br. at 39, so the writ cannot be in aid of the court's ***existing*** jurisdiction.

In any case, though Angela argues that it should not have been subject to a heightened standard, it could not have established its entitlement to a preliminary injunction under the lesser standard. Angela made no showing as to why the law and facts clearly favor its position, much less why it was likely to succeed on its claims. The district court correctly denied Angela's request.

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT NONE OF THE *WINTER* FACTORS SUPPORTED A PRELIMINARY INJUNCTION

### A. The district court did not abuse its discretion in finding that Angela failed to show likelihood of success on the merits

The first *Winter* factor—likelihood of success on the merits—is a "threshold inquiry" and "the most important" factor. *Garcia*, 786 F.3d at 740 (citation omitted); *VidAngel*, 869 F.3d at 856 (same). The district court was well within its discretion in concluding, that the evidence was insufficient to "establish[] either a probability of success on the merits or a serious question as to whether the law and facts 'clearly favor' [Angela's] position." 1-ER-17 (citation omitted). Given the evidence SWC provided to support its position, there was enough evidence before the district court to have shown that, if SWC had borne the burden of proof, it would have been entitled to an injunction.[12] Angela brings a pointless appeal.

On appeal, Angela does not seriously challenge the district court's finding by identifying any erroneous findings as to the likelihood of success on the merits. *See* Br. at 41-42. Hence, any challenge to the district court's findings related to this factor is waived. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[W]e will not consider any claims that were not actually

---

[12] Applying its erroneous burden shifting argument, Angela argues that SWC could not have proved its right to a preliminary injunction because there are "many disputed legal and factual issues." Br. at 31. But a likelihood of success on the merits is determined by the evidence presented to the court at the early stage of a proceeding, and not based on simply disputing the law and facts.

argued in appellant's opening brief." (citation omitted)). Angela instead argues that the issuance of a takedown notice interfered with its relationship with Valve and that the district court should have enjoined SWC from such interference. Br. at 41. This argument fails for two reasons.

First, by invoking the section 512's notice-and-takedown procedure, the copyright owner is asserting a legal right to protect its intellectual property. SWC's exercise of that role through issuing valid DMCA takedown notices is not an interference with any private commercial relationships. *See Rossi*, 391 F.3d at 1007 ("Because the MPAA acted in compliance with the DMCA and was otherwise justified in its response to Rossi's website, Rossi's tortious interference claim must fail."). Second, Angela did not even allege a tortious interference claim against SWC. 9-ER-2102-07.[13]

Therefore, the district court did not abuse its discretion on the most important *Winter* factor, and it was not required to consider the other *Winter*

---

[13] Angela claims that the harm it suffered under this theory is "irreparable" because SWC claimed that it was "*privileged* to induce breaches of contract by service providers to [Angela] ....," Br. at 24 (citing 2-ER-90-92), and that SWC "asserted that they are immune to liability for inducing breach of contract," *Id.* at 44 (citation omitted); *see also id.* at 9, 43. To state the obvious, a claim for interference with contract is customarily redressed by an award of money damages and, thus, does not create irreparable harm. Further, SWC confined its "privilege" assertions to claims for interference with contract and nothing further. In SWC's December 17, 2021 response to Angela, SWC wrote only that "DMCA notices ... cannot induce a breach of contract" and that these notices are "protected against state law claims by the litigation privilege." 8-ER-1987 (quoting *Stardock Sys.*, 2019 WL 8333514, at *5 ("[T]he Court finds that Plaintiff's interference [with contract] claims are predicated solely on the submission of the DMCA notices and are therefore preempted [by the Copyright Act.]")).

factors before denying the motion. *See Garcia*, 786 F.3d at 740 (9th Cir. 2015) ("Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three *Winter* elements" (internal quotation marks and citation omitted)); *California by and through Becerra v. Azar*, 950 F.3d 1067, 1083 (9th Cir. 2020) ("If a movant fails to establish likelihood of success on the merits, we need not consider the other factors." (citation omitted)). As discussed next, the district court did not commit any error with regard to the remaining factors.

### B. The district court did not abuse its discretion in finding that Angela lost under the remaining *Winter* factors

*Irreparable harm*: The district court did not abuse its discretion in concluding that Angela made an insufficient showing of irreparable harm. "The basis of injunctive relief in the federal courts is irreparable harm and inadequacy of legal remedies." *Nat'l Football League*, 634 F.2d at 1202 (citation omitted). As the district court noted, the primary injury Angela identifies is lost sales, but that economic injury alone does not support a finding of irreparable harm. 1-ER-18; *see also Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597,603 (9th Cir. 1991) ("economic injury alone does not support a finding of

irreparable harm because such injury can be remedied by a damage award" (citation omitted)).[14]

The mismatch between the alleged harm (loss of profit from *MoE*'s absence on Steam) and the requested remedy (SWC's withdrawing its takedown notices) also defeats Angela's ability to demonstrate irreparable injury (and not just standing). *See Garcia*, 786 F.3d at 744 ("The difficulty with Garcia's claim is that there is a mismatch between her substantive copyright claim and the dangers she hopes to remedy through an injunction."); *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981-82 (9th Cir. 2011) (affirming the district court's finding that Perfect 10 failed to establish irreparable harm where "Perfect 10 has not shown a sufficient causal connection between irreparable harm to Perfect 10's business and Google's operation of its search engine").

***Balance of equities***: The district court did not abuse its discretion in concluding that the balance of equities does not support the preliminary relief. The district court "balance[d] the interests of all parties and weigh[ed] the damage to each, mindful of the moving party's burden to show the possibility of irreparable

---

[14] To dispute this, Angela argues that *MoE* was "designed to interoperate with, and to be distributed and licensed ***exclusively*** through, the 'Steam' platform ...." Br. at 6 (emphasis added). That is not true. The game was hosted on other online platforms (*e.g.*, Tencent) and sold on SWC's own website. But even if true, that would have been Angela's decision, not SWC's. Thus, the harm was self-inflicted and insufficient to the irreparable-harm analysis. *See Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995); *see also Adtrader, Inc. v. Google LLC*, 2018 WL 1876950, at *4 (N.D. Cal. Apr. 19, 2018) ("Harm does not constitute irreparable injury if it is self-inflicted." (citation omitted)).

injury to itself and the probability of success on the merits," *Nat'l Football League*, 634 F.2d at 1203 (citation omitted), and concluded: "While the takedown from the Valve platform of plaintiffs' primary revenue-generating product represents a substantial injury to plaintiffs' business, defendants would suffer harm if stripped of their right to issue a DMCA notice of infringement," 1-ER-20.

***Public interest***: Finally, the district court did not abuse its discretion in concluding that "the public interest does not favor the issuance of a mandatory preliminary injunction." 1-ER-21. The DMCA reflects Congress' considered judgment that takedown in response to good faith assertions of infringement is in the public interest. *See WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) (citing *Golan v. Holder*, 565 U.S. 302, 328 (2012)) ("the public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating [the work]").

Finally, Angela does not challenge, and so waived, the district court's findings on these three remaining factors. In the Opening Brief, Angela does not discuss the district court's finding that Angela's injuries are compensable by an award of damages, or that its asserted non-monetary damages are not supported by sufficient proof. Angela also failed to address how and why the court made any erroneous findings on the balance of equities. Finally, Angela's does not address

the public-interest factor.  Angela thus waived its right to challenge the district court's finding on these factors.  *See Indep. Towers of Wash.*, 350 F.3d at 929.

## CONCLUSION

For the reasons stated above, the Court should either dismiss Angela's appeal because Angela lacks constitutional standing, or affirm the district court's order denying the preliminary injunction.

DATED:  March 31, 2022                    Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Robert M. Schwartz*
      Robert M. Schwartz
      Attorneys for Appellees
      Snail Games USA, Inc. and
      Wildcard Properties LLC

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 22-55137

I am the attorney or self-represented party.

**This brief contains** | 11,822 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ( ) it is a joint brief submitted by separately represented parties;

    ( ) a party or parties are filing a single brief in response to multiple briefs; or

    ( ) a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated |      | .

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Robert M. Schwartz     **Date** | 03/31/2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

## STATEMENT OF RELATED CASES

As of March 31, 2022, Appellees are not aware of any cases that should be deemed related under Ninth Circuit Rule 28-2.6.

DATED:  March 31, 2022   Respectfully submitted,

           QUINN EMANUEL URQUHART &
           SULLIVAN, LLP


        By: */s/ Robert M. Schwartz*
         Robert M. Schwartz
         Attorneys for Appellees
         Snail Games USA, Inc. and
         Wildcard Properties LLC

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2022, I electronically filed the foregoing **Appellees' Answering Brief** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 31, 2022  By  */s/ Robert M. Schwartz*
                                 Robert M. Schwartz

# ADDENDUM: PERTINENT STATUTES

# <u>TABLE OF CONTENTS</u>

| Statute | Page |
|---|---|
| 17 U.S.C. § 512(c) | 1 |
| 17 U.S.C. § 512(f) | 4 |
| 17 U.S.C. § 512(g) | 5 |
| 17 U.S.C. § 512(j) | 7 |
| 17 U.S.C. § 512(k) | 9 |

**17 U.S.C. § 512(c)**

**(c)** **Information residing on systems or networks at direction of users.–**

    **(1)** **In general.**–A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider–

        **(A)** **(i)** does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

            **(ii)** in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

            **(iii)** upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

        **(B)** does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

        **(C)** upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

    **(2)** **Designated agent.**–The limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:

        **(A)** the name, address, phone number, and electronic mail address of the agent.

**(B)**    other contact information which the Register of Copyrights may deem appropriate.

The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, and may require payment of a fee by service providers to cover the costs of maintaining the directory.

**(3)**    **Elements of notification.–**

**(A)**    To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:

> **(i)**    A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

> **(ii)**    Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

> **(iii)**    Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

> **(iv)**    Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

> **(v)**    A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

2

**(vi)** A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

**(B) (i)** Subject to clause (ii), a notification from a copyright owner or from a person authorized to act on behalf of the copyright owner that fails to comply substantially with the provisions of subparagraph (A) shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent.

**(ii)** In a case in which the notification that is provided to the service provider's designated agent fails to comply substantially with all the provisions of subparagraph (A) but substantially complies with clauses (ii), (iii), and (iv) of subparagraph (A), clause (i) of this subparagraph applies only if the service provider promptly attempts to contact the person making the notification or takes other reasonable steps to assist in the receipt of notification that substantially complies with all the provisions of subparagraph (A).

**17 U.S.C. § 512(f)**

**(f)    Misrepresentations.**–Any person who knowingly materially misrepresents under this section–

    **(1)**    that material or activity is infringing, or

    **(2)**    that material or activity was removed or disabled by mistake or misidentification,

shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

**17 U.S.C. § 512(g)**

**(g)** **Replacement of removed or disabled material and limitation on other liability.–**

    **(1)** **No liability for taking down generally.**–Subject to paragraph (2), a service provider shall not be liable to any person for any claim based on the service provider's good faith disabling of access to, or removal of, material or activity claimed to be infringing or based on facts or circumstances from which infringing activity is apparent, regardless of whether the material or activity is ultimately determined to be infringing.

    **(2)** **Exception.**–Paragraph (1) shall not apply with respect to material residing at the direction of a subscriber of the service provider on a system or network controlled or operated by or for the service provider that is removed, or to which access is disabled by the service provider, pursuant to a notice provided under subsection (c)(1)(C), unless the service provider--

        **(A)** takes reasonable steps promptly to notify the subscriber that it has removed or disabled access to the material;

        **(B)** upon receipt of a counter notification described in paragraph (3), promptly provides the person who provided the notification under subsection (c)(1)(C) with a copy of the counter notification, and informs that person that it will replace the removed material or cease disabling access to it in 10 business days; and

        **(C)** replaces the removed material and ceases disabling access to it not less than 10, nor more than 14, business days following receipt of the counter notice, unless its designated agent first receives notice from the person who submitted the notification under subsection (c)(1)(C) that such person has filed an action seeking a court order to restrain the subscriber from engaging in infringing activity relating to the material on the service provider's system or network.

    **(3)** **Contents of counter notification.**–To be effective under this subsection, a counter notification must be a written communication

provided to the service provider's designated agent that includes substantially the following:

**(A)**     A physical or electronic signature of the subscriber.

**(B)**     Identification of the material that has been removed or to which access has been disabled and the location at which the material appeared before it was removed or access to it was disabled.

**(C)**     A statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled.

**(D)**     The subscriber's name, address, and telephone number, and a statement that the subscriber consents to the jurisdiction of Federal District Court for the judicial district in which the address is located, or if the subscriber's address is outside of the United States, for any judicial district in which the service provider may be found, and that the subscriber will accept service of process from the person who provided notification under subsection (c)(1)(C) or an agent of such person.

**(4)**     **Limitation on other liability.**–A service provider's compliance with paragraph (2) shall not subject the service provider to liability for copyright infringement with respect to the material identified in the notice provided under subsection (c)(1)(C).

**17 U.S.C. § 512(j)**

**(j)**     **Injunctions.**–The following rules shall apply in the case of any application for an injunction under section 502 against a service provider that is not subject to monetary remedies under this section:

    **(1)**     **Scope of relief.—**

       **(A)**     With respect to conduct other than that which qualifies for the limitation on remedies set forth in subsection (a), the court may grant injunctive relief with respect to a service provider only in one or more of the following forms: !

          **(i)**     An order restraining the service provider from providing access to infringing material or activity residing at a particular online site on the provider's system or network.

          **(ii)**     An order restraining the service provider from providing access to a subscriber or account holder of the service provider's system or network who is engaging in infringing activity and is identified in the order, by terminating the accounts of the subscriber or account holder that are specified in the order.

          **(iii)**     Such other injunctive relief as the court may consider necessary to prevent or restrain infringement of copyrighted material specified in the order of the court at a particular online location, if such relief is the least burdensome to the service provider among the forms of relief comparably effective for that purpose.

       **(B)**     If the service provider qualifies for the limitation on remedies described in subsection (a), the court may only grant injunctive relief in one or both of the following forms:

          **(i)**     An order restraining the service provider from providing access to a subscriber or account holder of the service provider's system or network who is using the provider's service to engage in infringing activity and is identified in the order, by terminating the accounts of the subscriber or account holder that are specified in the order.

       **(ii)**    An order restraining the service provider from providing access, by taking reasonable steps specified in the order to block access, to a specific, identified, online location outside the United States.

**(2)**    **Considerations.**–The court, in considering the relevant criteria for injunctive relief under applicable law, shall consider--

    **(A)**    whether such an injunction, either alone or in combination with other such injunctions issued against the same service provider under this subsection, would significantly burden either the provider or the operation of the provider's system or network;

    **(B)**    the magnitude of the harm likely to be suffered by the copyright owner in the digital network environment if steps are not taken to prevent or restrain the infringement;

    **(C)**    whether implementation of such an injunction would be technically feasible and effective, and would not interfere with access to noninfringing material at other online locations; and

    **(D)**    whether other less burdensome and comparably effective means of preventing or restraining access to the infringing material are available.

**(3)**    **Notice and ex parte orders.**–Injunctive relief under this subsection shall be available only after notice to the service provider and an opportunity for the service provider to appear are provided, except for orders ensuring the preservation of evidence or other orders having no material adverse effect on the operation of the service provider's communications network.

**17 U.S.C. § 512(k)**

**(k)    Definitions.–**

**(1)    Service provider.–**

    **(A)**    As used in subsection (a), the term "service provider" means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received.

    **(B)**    As used in this section, other than subsection (a), the term "service provider" means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A).

**(2)    Monetary relief.**–As used in this section, the term "monetary relief" means damages, costs, attorneys' fees, and any other form of monetary payment.